MOSHIER *vs.* THE UTICA AND SCHENECTADY RAILROAD CO.

Where a horse, while being led along the highway, by its owner, is so frightened by an engine and train of cars rapidly passing along upon a railroad near by, that he bursts a blood vessel, and dies, no action will lie against the railroad company, for the injury; unless it was the result of some wrongful act of the company, either of omission or commission.

The mere *noise* made by an engine and train of cars, in the abstract, affords no evidence of a culpable inattention to the rights of others.

An authority to use an engine for the purpose of propelling cars upon a railroad, is an authority to make a noise, whether it awakens fear or not.

Moshier *v.* The Utica and Sch. Railroad Co.

But where the charter of a railroad company required them to purchase a turnpike road running parallel to the proposed railroad, and to assume the liabilities of that corporation, before they should be permitted to run cars upon their own road; and gave them the right to lay their railroad track across and along the bed of the turnpike, but required them " to restore the road to its former state, or in a sufficient manner not to impair its usefulness ;" *Held*, that if the taking of a part of the bed of the turnpike, for the track of the railroad, or the bringing the railroad into close proximity to the turnpike, rendered it dangerous to persons travelling with teams on the latter, and thus impaired its usefulness to the public, the railroad company was bound either to remove the two roads further from each other, or to separate them by protecting guards.

It is, in such a case, the duty of the railroad company to see that the two roads do not interfere with each other.

And if an encroachment is made by the railroad company upon the turnpike, and it neglects to restore the turnpike to its required width, and omits all other precautions against accidents, in consequence of which neglect of duty the noise and sight of a train of cars upon the railroad frighten a horse lawfully passing along the turnpike and thus cause his death, the railroad company is liable to the owner for the injury.

Such an encroachment by a railroad company, upon a turnpike, is a public nuisance, for which any person sustaining a particular injury may maintain an action.

In such an action the questions, whether the defendants have been guilty of a want of ordinary care and foresight, in constructing their railroad and turnpike too near to each other, and without any screen between them, and whether this was the proximate cause of the injury complained of, are proper questions for the consideration of the referees ; and their finding is conclusive.

What degree of care in constructing a railroad does the law exact from a railroad company ?

THIS was an action on the case, brought by the plaintiff against the defendants for negligence, by means of which a valuable horse of the plaintiff was frightened and thereby killed. The accident happened on the 21st of June, 1847, on the Mohawk turnpike road, about a mile west of the village of Amsterdam, in the county of Montgomery. The declaration contained six counts. In some of the counts it was alledged that the defendants were the proprietors of the Mohawk turnpike, and subject to the responsibilities, duties, liabilities, pains and penalties which appertained to the president and directors of said Mohawk turnpike company, yet they had so constructed their railroad as to essentially narrow the bed of the said turnpike; that they had excavated a part of the said turnpike in

order to lay the track of the railroad about five feet lower than the surface of the turnpike, thus making a steep bank from the bed of the turnpike to the railroad, and had omitted to ‿erect any fence, or screen between the turnpike and the railroad, and had suffered obstructions to be upon the turnpike. That on the day in question the plaintiff was lawfully leading his horse along the said turnpike, when the defendants' engine and train of cars going from Schenectady to Utica passed rapidly along, thereby so frightening the horse of the plaintiff, that he being so incumbered by the narrowness of the road, by agitation and fear, burst a blood vessel and died. The injury and the defendants' negligence were stated in various ways. No question was raised upon the pleadings.

The proof in substance was that about 9 o'clock in the morning of the 21st of June, as the plaintiff was leading his horse, on the Mohawk turnpike, about a mile west of the village of Amsterdam, and going towards that village, he met a train of the defendants' cars, drawn by a locomotive, and going west, at the usual speed, whereby the plaintiff's horse became greatly frightened, reared up, and pitched and jumped about, and as the cars passed, fell down in the road dead. There was evidence tending to show that the horse ruptured an internal blood vessel, as blood issued from his mouth. The plaintiff held the horse by the head and did every thing in his power to hold him, and to calm him. At the spot where the accident happened there was a pile of slabs, on the north side of the turnpike, where the ditch should be. The bed of the turnpike was about five or six feet higher than the railroad, and there was a bank on the south side of the road nearly perpendicular, occasioned by excavating for the track of the railroad. There was a pile of lumber lying on the edge of this bank. The bed of the turnpike was twenty-three feet wide, from where the ditch should be on the north side to the edge of the bank; and from the edge of the bank to the north track of the railroad was twenty-two feet. There was no fence or screen between the railroad and the turnpike. It was admitted that the defendants were the owners of the turnpike, and bound to keep it in repair and free from obstructions.

· One witness testified that he thought the engine blowed off more steam than usual that morning. No effort was made to check the motion of the cars, when the horse was seen. The engineer swore that he saw the horse and closed the valve, to prevent steam from blowing off; that they were going at their usual rate; that he had often passed horses near this spot before, without injury to them.

The act incorporating the "Mohawk Turnpike and Bridge Company," (*Sess. Laws of* 1800, *p.* 438,) was put in evidence. The act required the road to be constructed on the north side of the Mohawk, from Schenectady through Amsterdam to the village of Herkimer, and from thence to the city of Utica. The company were required, by the 5th section, to lay out and maintain their road to the width of 30 feet between the ditches, and to make and maintain the bed of their road to the width of 18 feet, and to keep the same in good repair.

On the 29th April, 1833, (*Laws of* 1833, *p.* 462,) the defendants were incorporated and authorized to construct a railroad, "commencing at or near the city of Schenectady, and running thence on the north side of the Mohawk river, as far as the village of Herkimer, and terminating in the city of Utica, and to transport persons and their baggage upon the same, by the power and force of animals, or of any mechanical power, or of any combination of them, which the said company may choose to employ." By the ninth section of the act, the company were authorized, when it became necessary to intersect or cross any stream, or any road or highway, "to construct the said railroad across or upon the same;" but they were required "to restore the stream or water-course, or road or highway thus intersected, to its former state, or in a sufficient manner not to have impaired its usefulness." By the 17th section the defendants were required to pay to the president, directors and company of the Mohawk turnpike company, for the stockholders of said company, $22,50 on each and every share of stock in said company. And by the 18th section it was enacted, that on making such payment, the defendants should possess all the rights, privileges, property and estate of the said turnpike company, and be subject to the same

responsibilities, duties, liabilities, pains and penalties; and that after completing the said railroad they might abandon said turnpike on giving notice, &c. "But until the said turnpike is abandoned the said company shall keep it in as good repair as it now is."

The value of the horse was proved, and the referees reported in favor of the plaintiff $400 and the costs.

The defendants now moved to set aside the report, and the cause was submitted on written points, by

*M. T. Reynolds,* for the defendant.

*C. B. Cochran,* for the plaintiff.

*By the Court,* WILLARD, J.   If the injury complained of was not the result of some wrongful act of the defendants, either of omission or commission, the present action can not be sustained.   It was not wrongful for the defendants to propel their cars along their railroad by a steam engine, although steam, as a motive power, is not mentioned in the act of incorporation. Indeed, we know historically, that the act incorporating the defendants could not have been passed at the session of 1833, if a steam engine had been in terms mentioned in the act as the power by which the business of the company was to be conducted.   It is, however, "a mechanical power," within the meaning of the charter, and was rightfully applied.   Nor is there any evidence that the *manner* in which the defendants conducted the train, on the morning when the disaster happened, was unusual, or indicated an inattention to the rights of others.   The working of the engine and the progress of the train occasioned much noise.   Although this may, under some circumstances, excite the most intense fear, it is esteemed, in general, a beneficent admonition to avoid danger.   It is a part of the constitution of a steam engine that it should, while in operation, make a noise.   An authority to use an engine, is an authority to make a noise; whether it awakens fear or not.   A train of cars that should move with entire silence through the valley of the

Mohawk, would occasion more mischief than if its progress was heralded by the noise of many locomotives. Indeed, the policy of the general act to authorize the formation of railroad corporations, passed March 27, 1848, (*Laws of* 1848, *p*, 221,) is to require a bell of thirty pounds to be kept ringing for a quarter of a mile before the train crosses a road, as a precaution against accidents. (*Id.* § 37.) The engineer is there required to add to the usual noise of the engine and the train, the noise of the bell, to which is not unfrequently added the noise of the whistle. The mere *noise* of the defendants' train, in the abstract, therefore, affords no evidence of a culpable inattention to the rights of others.

But it is not to be denied that there are times and places in which the noise of a locomotive and the train is attended with distressing effects. Where the railroad and turnpike are parallel, and in immediate contiguity to each other, persons travelling on the latter with horse teams are sometimes exposed to imminent danger, by the mere noise and sight of a moving train. It was in part the anticipation of this danger and the necessity of guarding against it, that dictated the policy of requiring the defendants to purchase the turnpike, and to assume the liabilities of that corporation, before they should be permitted to run cars upon their own road. They thus acquired the right of laying their railroad track across and along the bed of the turnpike, without an application to the chancellor for appraisers, but they were bound " to restore the road to its former state, or in a sufficient manner not to impair its usefulness." If the taking a part of the bed of the turnpike for the track of the railroad, or the bringing the railroad into close proximity to the turnpike, renders it dangerous to persons travelling with teams on the latter, and thus impairs its usefulness to the public, the defendants are bound either to remove the two roads further from each other, or to separate them by protecting guards. There is room enough in the Mohawk valley for both roads ; and it is for the defendants to see that they do not interfere with each other. The referees must have found that the encroachment by the railroad upon the turnpike, at the place of the disaster, enabled the noise and

sight of the train to frighten the plaintiff's horse and thus to cause his death. The defendants, by not restoring the turn-pike to its required width, and by omitting all other precautions against accidents, have disregarded the injunctions of the stat-ute, and if that neglect of duty has been the proximate cause of the plaintiff's injury, as the referees must have found, he was entitled to recover. The encroachment of the defendants upon the turnpike was a public nuisance, for which any person sus-taining a particular injury may maintain an action. (*Lansing* v. *Smith,* 4 *Wend.* 9. *Stetson* v. *Faxon,* 19 *Pick.* 147. 10 *Id.* 388. 1 *Root,* 362. 3 *Verm. Rep.* 529.) The English statute requires the railroad company to maintain gates, whenever their track crosses a public road, and to employ proper persons to open and shut them; and to keep them constantly closed ex-cept when horses, &c. passing along such road have to cross the railway. (5 *and* 6 *Victoria* 55, *ch.* 9.) If the danger of merely crossing a public road by the railway, renders these precautions necessary for safety, much more will the taking of a portion of the road, in a longitudinal direction, thus bringing the railroad train and travellers on the turnpike, for a longer time, in close contiguity to each other, demand stringent measures of protec-tion. If this protection can not be afforded by a fence or screen, the defendants must move the tracks of the respective roads at a greater distance from each other.

It is urged that no action lies for so exciting the fears of an animal as to cause its death. If a horse be frightened by an-other and runs away with a carriage, and breaks it, or destroys his own life by running against a wall, there can be no doubt that an action will lie. In *Cole* v. *Fisher,* (11 *Mass.* 137,) it was held that an action on the case could be maintained against a defendant who carelessly discharged a gun by which a horse was frightened and the owner or bailee injured. And in *Loubz* v. *Hafner,* (1 *Dev.* 185,) it was decided that trespass would lie against a man for beating a drum in a highway, when a wagon and train are passing, by which the horses are frightened, and run away and injure the wagon. And in our own state, an action was sustained for killing a horse, whose death was occa-

sioned by running onto a pile of wood, to which he was fright-ened by a malicious dog of the defendant. (*M. S.*) Whether the death be occasioned by external violence to the animal, or by an internal rupture, can make no difference in principle, if the fear which is the proximate cause of the injury was excited by an unlawful act of the defendants, or by an act in itself inno-cent, but performed in an unlawful place, without the precau-tion which prudence requires.

In the present case, the *noise* of the moving train could not have been prevented, and was not unlawful, *per se.* The *ap-pearance* of the train might have been concealed by a screen, and the effect of both the noise and the appearance been de-stroyed by placing the two roads at a suitable distance apart. The defendants, aided by the improvements of modern science, and stimulated no doubt by a laudable spirit of enterprise, were engaged in a mode of transportation, unknown to the common law, and which, without the authority of a statute, would be an indefensible nuisance. What degree of care does the law exact from persons standing in this relation to the public? This has been as accurately defined as the nature of the subject admits, in recent cases decided by this court and the late court for the correction of errors. Thus in *The Mayor of New York* v. *Bai-ley*, (2 *Denio*, 433, 440,) the chancellor, in delivering his opinion in the court of errors in that case, (which was for an injury oc-casioned by negligence in the construction of the Croton dam,) says: "The degree of care and foresight which it is necessary to use, in cases of this description, must always be in proportion to the nature and magnitude of the injury that will be likely to result from the occurrence which is to be anticipated and guard-ed against. And it should be that care and prudence which a discreet and cautious individual would or ought to use if the whole risk and loss were to be his own exclusively." A similar rule was laid down at the circuit, and approved by the supreme court, in *Cook* v. *The Champlain Transportation Company*, (1 *Denio*, 91, 97, 102.) That action was brought for the loss of the plaintiff's steam saw mill and a quantity of lumber, occa-sioned by fire communicated by a spark from the steam engine

Moshier *v.* The Utica and Sch. Railroad Co.

of. one of the defendants' boats, in a dry and windy day, as the boat was leaving the basin at 'Whitehall, on Lake Champlain. The circuit judge held the defendants to ordinary care, and remarked that in applying the rule to the case then on trial, " regard must be had to the actual state of things at the time, the force and direction of the wind, the dryness of the weather, the proximity of the building to the water ; and that what might be ordinary care in a still or wet day, might not be in a windy or dry one, and when near to combustible matter ; that the jury were to pass upon these questions, and to determine whether the defendants' agents adopted the ordinary precautions, such as are usual in similar cases to prevent injuries." This was merely saying in other words, that the care of the defendants should be in proportion to the danger which might be reasonably anticipated at the time. We had occasion to examine the subject with respect to care and negligence in the conducting of locomotives, in *Brand* v. *The Schenectady and Troy Railroad Co.*,(*a*) at the present term, and will not repeat what has there been said.

Whether the defendants had been guilty of a want of ordinary care and foresight in constructing their railroad and turnpike so near to each other and without any screen between them, and whether this was the proximate cause of the horse's death, were proper questions for the consideration of the referees, and their finding is conclusive. (*Esterly* v. *Cole*, 1 *Barb. S. C. Rep.* 235. 12 *Wend.* 27. 5 *Id.* 48.)

The motion to set aside the report of the referees should be denied.

(*a*) Ante, p. 368.